UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:16-00117 |
| | ) | Judge Sharp |
| ROBERT F. ARNOLD, | ) | |

**MEMORANDUM**

Pending before the Court is Defendant Robert F. Arnold's "Motion for Review of September 29, 2016 Detention Order" (Docket No. 92), to which the Government has responded in opposition (Docket No. 98) and supplemented that response (Docket No. 100). By way of the Motion, Defendant requests that the Court overrule Magistrate Judge Newbern's determination that "there is no condition or combination of conditions that can ensure the safety of any other person or of the community, particularly in light of Sheriff Arnold's ability to use his office for harassment and intimidation" and that his "lack of candor with Pretrial Services demonstrates he is unlikely to abide by any conditions or combinations of conditions the Court could impose." (Docket No. 85 at 12).

On November 2, 2016, the Court held a full-day hearing on Defendant's Motion and received further evidence. For the reasons that follow, the Court will deny Defendant's request that he be released pending trial.[1]

**I.**

When a defendant is detained by order of a Magistrate Judge, the defendant "may file with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). "Review of the Magistrate Judge's decision is *de novo*, 'although the

---

[1] As a technical point, Defendant's Motion is couched as a request for review, which the Court has granted by hearing the evidence and deciding the issues presented.

1

district court may conduct its review and base its decision on the evidence presented to the magistrate at the detention hearing.'" United States v. Massey, 2014 WL 3671885, at *1 (M.D. Tenn. July 23, 2014) (citation omitted).

Here, the Court has read the transcript of the hearing before the Magistrate Judge and reviewed the evidence admitted during those proceedings. The Court has also considered the evidence adduced at the November 2, 2016 hearing, including Defendant's testimony and the recordings of phone calls from the Grayson County Detention Center where he is housed.

## II.

After being indicted and arrested on fourteen assorted federal crimes[2] arising out of the sale of e-cigarettes to inmates at the Rutherford County Jail through JailCigs, Defendant was released pursuant to 18 U.S.C. § 3142. That release was subject to certain conditions, the first of which was that he "not violate federal, state or local law while on release." (Docket No. 10 at 1). On September 26, 2016, the Government filed a Motion to Revoke Pretrial Release (Docket No. 85), alleging that Defendant committed domestic violence and then coerced the victim to lie about the events.

### A.

A violation of any condition of pretrial release is governed by 18 U.S.C. § 3148, which provides that "[a] person who has been released under section 3142 of this title, and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a). The statute goes on to provide:

---

[2] The charges include conspiracy, mail and wire fraud, honest services fraud, Hobbs Act extortion, bribery, and obstruction of justice.

The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer

> (1) finds that there is –
>
>> (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release[3] . . .
>
> (2) finds that –
>
>> (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>>
>> (B) the person is unlikely to abide by any condition or combination of conditions.

18 U.S.C. § 3148(b). The statute also contains a presumption: "If there is probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community." Id.

**B.**

'[T]he analytical process under 18 U.S.C. 3148 is plain," United States v. Jones, 2009 WL 1360672, at *2 (E.D. Ky. May 12, 2009), and Magistrate Judge Newbern correctly followed that process. She made three overriding findings, which the Court highlights in order to place Defendant's new arguments in context.[4]

---

[3] "There is no limitation in section 3148(b) regarding the types of categories of Federal, State, or local crimes that will support an order revoking pretrial release." United States v. Williams, 2015 WL 9480013, at *2 (D. Nev. Dec. 29, 2015).

[4] The details supporting Magistrate Newbern's findings are throughly set out in her September 29, 2016 Order (Docket No. 85), familiarity with which is assumed.

First, Magistrate Judge Newbern found probable cause to believe that Defendant committed domestic assault this past Labor Day, September 5, 2016, in violation of Tenn. Code Ann. § 39-13-111. That finding is supported by the testimony of Special Agent James Scarbro of the Tennessee Bureau of Investigation ("TBI") who oversaw the investigation regarding alleged domestic assault by Defendant, and who submitted a written statement from then-Special Agent Brian Harbaugh. In that statement, Ms. Arnold claimed that she was physically assaulted by her husband and described in detail the nature of the assault.[5]

The finding of probable cause is also supported by a recorded conversation between Mrs. Arnold and Elijah Stuard in which she stated that, during the course of an argument, Defendant "shoved [her] down" and "pushed [her] over to the closet." (Docket No. 96, Hrg. Trans. Vol 1 at 38-39). She also stated that she was "scare[d]," "freaking out," and "started shaking" when Defendant climbed on top of her on the bed. (Id. at 43).

Even in an affidavit submitted on behalf of Defendant in anticipation of the hearing before the Magistrate Judge, Mrs. Arnold stated that, during the course of the "argument," they "had some physical interaction during which each of us was aggressive towards the other." (Megan Arnold 9/23/2016 Aff. ¶ 6). She also stated that, at some point during the "incident," she "became concerned for [her] own welfare." (Id.).

Second, Magistrate Judge Newbern found probable cause to believe "that Sheriff Arnold intentionally harassed Megan Arnold in an attempt to dissuade her from reporting to law enforcement a violation of his conditions of release pending judicial proceedings." (Docket No. 85

---

[5] As Magistrate Judge Newbern observed, Mrs. Arnold did not sign the statement, but, according to Agent Scarbro, she twice-confirmed that the contents were correct.

at 9). This finding is again supported by Mrs. Arnold's TBI statement in which she stated that, on the heels of the altercation, Defendant summoned his subordinate, Deputy Todd Hammond, to the home and, in his presence, told his wife that she could be arrested for domestic assault because she "pinch[ed] his nipple." (Docket No. 96, Hrg. Trans. Vol. I at 26). Additionally, a statement from Deputy Hammond indicated that he went to the Arnold's home at Defendant's request and instructed Mrs. Arnold, in accordance with Defendant's directive, that pinching another's nipple could be characterized as assault, although Deputy Hammond claims it was all in jest. More importantly, in her TBI statement, Mrs. Arnold stated that, after the incident, she and her husband talked several times, and that he told her what she could and could not report, "made it clear that he does not want [her] reporting the truth about what happened," and stated that, if she reported it, "he would go to jail and [she] would lose the house and everything [she] ever had." (Id. at 27). Further, after Mrs. Arnold made her statement, Defendant contacted his supervising Probation Officer, apparently in an effort to obtain a copy of the TBI statement or the recorded conversation. (Docket No. 85 at 9).

Third, Magistrate Judge Newbern found that Defendant had not overcome the rebuttable presumption that attaches when there is probable cause to believe that a defendant has committed a crime while on pretrial release. In so doing, she considered the testimony of JoEllen Standifer (Mrs. Arnold's mother and a part-time Sheriff's Office employee), Mrs. Arnold's affidavit, and a written statement from Deputy Hammond, along with a TBI report regarding its interview with him. In her opinion, however, that evidence was insufficient because, not only were "[t]he allegations of physical abuse and witness coercion . . . are serious and would require stringent conditions of release to guard against any further harm," the "proof regarding Sheriff Arnold's actions after the physical altercation demonstrates that he would not be likely to abide by any conditions or combination of

5

conditions the Court could impose." (Docket No. 85 at 11). This was because Defendant: (1) used his authority as Sheriff to summon Deputy Hammond to his home and to have him instruct Mrs. Arnold that she could go to jail for her actions; (2) texted Deputy Hammond saying, "we have to mess with Megan"; and (3) provided false statements about the Labor Day events to the Probation and Pretrial Services Office ("Probation Office").

With regard to the latter point, Vidette Putman, a supervisor in the Probation Office, testified that she spoke with Defendant by phone on September 6, 2016, and, when asked about the incident, he initially stated that nothing happened, but later admitted to having an argument while insisting there was no physical contact. The day after that conversation, Defendant met with Kimberly Haney, his pretrial services officer for his regularly scheduled reporting, and again claimed "nothing physical happened" over the Labor Day weekend. (Docket No. 96, Hrg. Trans. Vol. I at 126). When asked to provide a written statement, Defendant simply wrote on a legal pad, "nothing happened at my house." (Id. at 127). After learning that the TBI was conducting an investigation, Defendant called Ms. Haney, and told her that he would have his press secretary write a statement for him, but he would not sign it.

## C.

Defendant provides nothing from which the Court could conclude that the Magistrate Judge's findings were erroneous. The Court has reviewed the entire record and concludes that those finding are fully and amply supported by the evidentiary record.

In his Motion, rather than challenging specific findings, Defendant seeks to downplay the events or portray them in a more favorable light. In short, he has an excuse or explanation for everything.

Take, for instance, the tape recording between Mrs. Arnold and Mr. Stuard. Defendant asserts this "should be scrutinized through the prism" of Mrs. Arnold being "in the midst of a secret relationship with someone other than her husband," who sought "sympathy from the other participant and, at least initially, to utilize the events of September 5 to remove her husband from the home." (Docket No. 93 at 3). As for Defendant's behavior on the day in question, he claims that "it was out of character and he did not recall it later," having "consumed a considerable amount of alcohol prior to th[e] incident, as well [as] a dose of Ambien sleeping medication." (Id. at 2 & 3).[6] Defendant also blames the interactions between alcohol and Ambien as the basis for his statements to the Probation Office that nothing happened, and attributes wanting the Public Information Officer to prepare a written statement as being "a by-product of his inability to communicate effectively and grammatically in writing, and his embarrassment about that inability." (Docket No. 93 at 6-7). And as for the incident itself, Defendant suggests that it was "an exaggerated version of an argument blown out of proportion," or "[p]erhaps an embarrassing spectacle, but not an assault." (Id. at 4 & 5).

Defendant's efforts at misdirection continued during his testimony at the hearing before this Court. He claims to recall some of the events of the Labor Day evening and after, but not others.

For example, he remembers his wife pinching his nipple at the door to their bedroom, but denies remembering anything else until he was at the closest with a belt in his hand, which he claims he was just going to lift over his wife's shoulders and use to pull her from the room. It was during this supposed gap in memory that, according to Mrs. Arnold's statement to the TBI, Defendant

---

[6] At the hearing before this Court, Defendant testified that he consumed a 12-pack of beer over the course of several hours on Labor Day and followed it with an Ambien. He reluctantly conceded that he probably would not have passed a field sobriety test had he chosen to drive that afternoon.

7

pushed her to the ground and then punched her on the arm and shoulder. Similarly, other than remembering that his wife called him an "idiot" and wanting "him to go to jail," Defendant claims not to remember what else was said between his wife and Mr. Stuard, even though a tape of that telephone conversation was played in open court at the hearing before Magistrate Judge Newbern.

Defendant also claims that his memory again shorted-out at some point before Deputy Hammond arrived. This contradicts what he told the Probation Office two days later (that police were called to the scene), but is convenient because it enables him to claim a lack of recall of the events that led to Magistrate Judge Newbern's finding that he used the power of his office in summoning Deputy Hammond to the house and in threatening his wife with the possibility of jail.

Defendant also used his supposed lack of memory to explain why he told the Probation Office that nothing happened, claiming that some of his memory only came back after he and his wife discussed the incident later in the week.[7] This is convenient because his lack of candor with the Probation Office served as a basis for Magistrate Judge Newbern's conclusion that he had not rebutted the presumption for detention.

The supposed lack of recollection aside, Defendant was simply not a credible or believable witness. He testified that he "embellishes" things sometimes, an understatement if ever there were one given that he admitted in open court to fudging the truth during statistical presentations to the County Commission. Not only that, the evidence shows that Defendant is manipulative and deceptive.

For example, Defendant is segregated from other prisoners because of his employment as

---

[7] It was around this point that Defendant decided to take pictures of his foot, apparently in an effort to capture a supposed injury he sustained in the altercation.

a police officer. He wove this into an incredible story he told his wife – the jail Colonel told him that a "hit" was out on him, and that a gang member could earn a tear drop tattoo by plunging a shank into his neck. This was not only farcical, it was manipulative in the sense that he was trying to invoke sympathy or get a reaction. In response, Mrs. Arnold contacted one or more of his subordinates at the Rutherford County Sheriff's Department about the supposed hit. Later that day, Defendant spoke with Terry McBurney, a Major in the Sheriff's Department, and, in response to a question from Major McBurney, stated, "it's bullshit," and that he was just "trying to get Meagan . . . to really work hard at getting me the hell out of here." (Govt. Ex. 8 at 72). After Major McBurney reminded Defendant that the call was being recorded, he told Defendant, "You've got to – listen to me, man. Quit playing the games. Ok? It's not going to serve you any purpose. You understand? . . . You got to stop playing it." (Id. at 73). While Defendant said he understood, this Court has doubts that he will follow that sage advice.

Yet another unbelievable tale related to his explanation as to why he did not want his wife talking to the TBI. According to him, this was not because he was afraid of what she might say. Rather, he was concerned that, because Agent Scarbro was "good looking," this might lead to an affair with his wife. The very idea that Defendant was really concerned about a possible amorous relationship is belied by the fact that, in another recorded jail conversation, he told his mother that either she or someone else needed to tell his wife that "she's got to make sure she stays off the phone with them. I mean, because they will do everything they can to become her best friend and because they want to try to get her to testify or to do whatever." (Id. at 13). Defendant also said "you've got

9

to figure out how to nicely explain it. I've been doing it, too. But we got to keep that going." (Id.).[8]

Defendant also claims that he told his wife to tell the truth to law enforcement authorities. He argues that this is supported by a tape recorded jail call in which he repeatedly told his wife to "tell the truth". In actuality, however, he was not asking that his wife tell the unvarnished truth. Rather, he told her to tell officers that she was the aggressor, something which Mrs. Arnold repeatedly denied in the call.

The breadth of Defendant's prevarication while on the stand is difficult to capture in written words. Time and again he was confronted with inculpating evidence but, true to form, he offered excuses or explanations that were incredible and oftentimes inconsistent with his other testimony. Even his plea to the Court to release him and his assertion through tears, real or manufactured, that he would comply with whatever conditions were imposed was not believable.

At the hearing before this Court, Defendant also claimed that his wife has her own difficulty with the truth - testifying "if you know my wife and how she lies and/or embellishes stuff all the time, then you know my wife," yet, curiously enough, a centerpiece of his Motion for Review is a second Affidavit from her. She did not appear in Court nor did she testify at the hearing, and, thus, the Court has no basis for assessing her credibility.

In her second Affidavit, Mrs. Arnold maintains that she is "careful to be factually correct in this affidavit as it relates to our relationship, my opinions and belief about my husband's intentions

---

[8] The Court recognizes that Defendant has a legitimate concern about his wife implicating him on the charges underlying the Indictment. However, the Court does not believe Defendant's comments were directed solely at that issue given that the conversation was in the context of him being served (presumably with an ouster suit) and his statement that the "they keep trying to call her[], you know, tell her she's a victim and civil advocacy, bullshit, this and that." (Id.). The conclusion that Defendant is insistent that his wife not talk about the Labor Day events is supported by the recorded telephone conversation that she had with Mr. Stuard.

towards me and our family, the incident on September 5, 2016, and the events that followed." (Docket No. 93-1 at 1). The Affidavit then attempts to explain-away (or at least downplay) the proof in the record supporting Magistrate Newbern's findings of probable cause to believe a domestic assault occurred and that Defendant used his position to threaten or intimidate his wife.

By way of summary, Mrs. Arnold claims:

› Her husband never used power or authority of his office, or his position as a law enforcement officer, to threaten, harass or intimidate her, and she, as well as all those present, "knew that he was making a joke when he asked Deputy Hammond if I could be jailed for my behavior earlier that evening."

› Her husband is a gentle man who occasionally loses his temper, but his "outbursts are not directed at [her] or [the] children."

› She does not consider the incident on September 5, 2016 to constitute an assault, nor does she believe that Defendant would intentionally harm her – she only became briefly concerned that her husband "might inadvertently hurt [her] because of [the] size difference."

› She avoided talking to the TBI initially because she considered the matter private and embarrassing. As for her discussions with that agency, she recalls telling TBI agents "something to the effect that Robert pushed me and I fell into the hall outside our bedroom," but, "[t]o be precise," she fell because the two were "engaged in a shoving match" at the bedroom door and, when she "pinched him" and "kicked him hard," he "reacted instinctively by striking out and hitting [her] on the shoulder without causing any injury or significant discomfort," which "should be the end of the matter."

› Nothing like the incident at issue occurred in the past, and she believes "the combination of alcohol and Ambien caused or contributed to this incident."

› The recorded telephone conversations with Mr. Stuard were made at a time when she "was angry and upset" and in a "very emotional state," and she only said she wanted her husband sent to jail because she was mad at him about the Labor Day events and upset over the frequent marital disputes that they had over the prior few months.

› She believes that, for at least several days, Defendant had very little recollection of the Labor Day events.

11

(Id. at ¶¶ 4-11). Tellingly, and even though Mrs. Arnold's second Affidavit is cleverly crafted and addresses precise points, it does not dispute that the two engaged in a shoving match and Defendant hit her during the course of a domestic dispute. Nor does it disavow the bulk of the statements attributed to her by the TBI agent.

**D.**

The rose-colored glasses prescribed by Defendant does not change this Court's view of the evidence. Nor does it change the Court's conclusion that the decision to detain him is correct under the circumstances.

Defendant lays most of the blame for his actions on his consumption of a large amount of alcohol, topped off by a dose of Ambien. While Defendant was not subject to the standard supervised release condition that he not drink alcohol (or even that he refrain from consuming alcohol in excess), it is common knowledge that over-imbibing can alter behavior and lead to trouble. Adding prescription medication to the mix is a recipe for disaster, something the chief law enforcement officer of a sizeable county should have understood better than most.[9] Defendant's voluntary act simply does not excuse his conduct, particularly since he was on pretrial release and, therefore, already under scrutiny.

Moreover, the Court simply does not believe Defendant's alleged memory loss. He testified that he mixed alcohol and Ambien in the past, yet had no adverse effects, except, of course, when he combined the two on Labor Day. If, as he claims, he did not recall the events until he spoke with his wife days later, this does not explain why he initially told the Probation Office that nothing

---

[9] Even more, Defendant claims that the Ambien was prescribed to him. Presumably the bottle and/or accompanying insert came with warnings to abstain from drinking alcoholic beverages.

happened, instead of immediately fessing up by saying that he drank to excess, took a sedative, and, as a result, his memory was spotty.

On the issue of his interactions with the Probation Office, Defendant argues that he merely proposed having his Public Information Officer write a statement to cover the fact that he is a poor writer. Even if this is true, it does not explain why he stated he would not sign any such statement.

Defendant also claims "not [to] discount the phenomenon of abused spouses who are reluctant to come forward because of fear of the consequences (e.g., more abuse, loss of financial support)," (Docket No. 93 at 4), but does just that by effectively asking this Court to ignore her statement to the TBI and her conversations with Mr. Stuard. The Court declines that invitation for two reasons.

First, and as Magistrate Judge Newbern observed, "Ms. Arnold's statement to the TBI agents and her recorded conversations are consistent in their description of these events," and "[t]he credibility of Ms. Arnold's statements is also bolstered by the fact that the statements contain details of Ms. Arnold's participation in the physical altercation, including her twisting Sheriff Arnold's nipple and kicking him, that are against her interest." (Docket No. 85 at 6).

Second, the Court would have to ignore the fact that, since he has been detained, Defendant has cajoled and manipulated his wife. Not only did he tell his wife the tale about the hit, he accused her of wanting him to sit in jail; saying he was in jail "because of your fucking tapes"; imploring her to get him out of jail; suggesting that he might harm himself if he stays in jail by telling her to "tell my kids I loved them very much"; threatening to cut her out of his will; and repeatedly telling her that she is the only one that can "fix this." Defendant's efforts may well have had an impact on Mrs. Arnold's decision to submit the second Affidavit regarding the Labor Day altercation. Obviously,

13

the Court does not know this to actually be the case because Mrs. Arnold chose not to testify. Considering that she begins her affidavit by stating that ""[i]t is my hope that my husband will be released from jail and that he will be permitted to return to me and our children," (Deft. Ex. 1, Megan Arnold Aff ¶ 1), however, her absence would appear to speak volumes.

**E.**

In the concluding paragraph to his Memorandum, counsel for Defendant writes:

> incarceration pending trial is far too extreme of a measure to insure the safety of Mrs. Arnold—lesser measures could insure that incidents like whatever happened on September 5 do not happen again. Defendant has been incarcerated in "segregation" status since September 29 and is both willing and likely to carefully avoid any transgressions of any further conditions the Court imposes in order to secure and maintain his freedom and his unhampered ability to assist counsel in preparation for his February 7, 2017 trial. He does not relish a condition that would require him to avoid any contact with his wife, but would assiduously observe such a condition.

(Docket No. 93 at 7). While the Court agrees that continued incarceration imposes a burden, the Court does not share counsel's optimism that Defendant would abide by any conditions of release. Nor would it be enough, in the Court's view, to simply prohibit Defendant from seeing his wife, even assuming Defendant would follow any such order.

Defendant's willingness to use the power of his office to intimidate his wife, his willingness to try to mislead the Probation Office, and his willingness to deceive and obfuscate from the witness stand, among other things, gives this Court no basis from which to conclude that he can be trusted to abide by any conditions of release. Moreover, the Court is not convinced that Defendant will not try to manipulate others, or use the powers of his office for his own best interest were he to be released pending trial.

**III.**

On the basis of the foregoing, Defendant's "Motion for Review of September 29, 2016

Detention Order" will be denied.

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE